IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL ACTION FILE NO. |
| JESUS RAMON SICAIROS-SICAIROS and FELIPE SICAIROS-SICAIROS, | 4:10-CR-054-HLM-WEJ |
| Defendants. | |

## <u>NON-FINAL REPORT & RECOMMENDATION</u>

This matter is before the Court on defendant Jesus Sicairos-Sicairos's Motion to Suppress [28], and defendant Felipe Sicairos-Sicairos's Motion to Suppress [29]. On April 22, 2011, the Court conducted an evidentiary hearing [44, 45] on those Motions, the testimony from which has been transcribed [47, 48] (hereafter "Tr.").[1] On the basis of the testimony and evidence produced at the hearing, the undersigned **RECOMMENDS** that defendants' Motions to Suppress be **DENIED**.

---

[1] There was only one evidentiary hearing and only one transcript of that hearing, but each event received two docket entries.

AO 72A
(Rev.8/82)

## I.   STATEMENT OF FACTS

### A.   The Investigation

During the summer of 2010, Drug Enforcement Administration ("DEA") Special Agent ("SA") Terry Beard developed a confidential informant ("CI") in the course of working another case who identified Jesus Sicairos-Sicairos[2] as his source of supply for quarter-kilogram quantities of cocaine.  (Tr. 6-7, 23.)[3]  Jesus then became the target of a DEA investigation.  (Id. at 9.)  Conasauga Drug Task Force officers subsequently developed information on addresses associated with Jesus.  (Id. at 10, 21-22.)   At about 10:00 a.m. on October 14, 2010, officers established surveillance at a residence located at 3230 Resaca Lafayette Road (located north of Calhoun, Georgia).  (Id.)  Law enforcement assumed that Jesus would have to travel

---

[2] Because their surnames are the same, the Court obtained permission from defendants at the suppression hearing to call them by their forenames.  (Tr. 3.)  The Court respectfully continues that practice here for ease of reference and to avoid confusion.

[3] SA Beard testified that he took steps to corroborate the information received from the CI, which included checking the telephone number he provided and confirming that Jesus was the subscriber.  (Tr. 7-8.)  The CI also outlined how most of his drug transactions with Jesus had occurred, which SA Beard had confirmed through observing their meetings at a Marathon gas station.  (Id. at 8.)  One of those meetings was videotaped.  (Id. at 24-25.)  SA Beard obtained permission to use the CI from a judge, but he could make telephone calls only.  (Id. at 9, 26.)

2

somewhere to pick up the drugs ordered by the CI, so they began surveillance at that residence.  (Id. at 21-22.)  Officers maintained surveillance there until around 2:19 p.m., as discussed infra.  (Id. at 10-11.)

At approximately 1:40 p.m., SA Beard instructed the CI to place a recorded telephone call to Jesus and order one-quarter kilogram of cocaine for $8,200.  (Tr. 9, 11.)  Jesus replied that he was at work, and that he would try to get off and call him back later.  (Id. at 10.)  About seven minutes later (or about 1:47 p.m.), Jesus called the CI, and in a recorded conversation stated that he was going to call back in about fifteen minutes and then give him fifteen minutes' notice before they would meet and consummate the drug transaction.  (Id. at 10-11.)  This proposed schedule was consistent with other transactions between the CI and Jesus.  According to the CI, Jesus would meet him within fifteen minutes of a call if he had the cocaine, or it could take an hour if he had to go get it.  (Id. at 11.)[4]  The CI also relayed that Jesus had two sources of supply–an individual in Dalton and his brother (defendant Felipe), who lived in Calhoun.  (Id.)

_____

[4] The CI had also informed SA Beard that Jesus usually secreted the cocaine in a void in the center console of his car's front seat and used an electric screwdriver he kept in the car to remove the screws and retrieve the drugs.  (Tr. 12.)

3

At approximately 2:05 p.m., surveillance agents at the Resaca Lafayette Road residence observed Jesus arrive and pull his vehicle into the driveway. (Tr. 11.) He left about 2:19 p.m., and was followed by task force agents. (Id.)[5] SA Beard testified that officers maintained continuous surveillance on the car driven by Jesus from the time it left the residence until it was involved in a traffic stop (discussed infra). (Id. at 13-14, 16, 20, 33.)[6]

Shortly after he departed the residence, Jesus called the CI and told him that they should meet in fifteen minutes. (Tr. 11, 16.) In response to the CI's question about where they should meet, Jesus answered, "Where I work." (Id. at 11.)[7] This work location is directly across the street from the Marathon gas station where SA

---

[5] SA Beard conceded that his investigation tied Jesus to the Resaca Lafayette Road residence for only those few minutes (i.e., 2:05 through 2:19 p.m.) on October 14, 2010. (Tr. 21-22.)

[6] Agents did not follow Jesus from his work location (i.e., Church Chair) to the Resaca Lafayette Road residence. (Tr. 20, 23.) However, SA Beard testified that the elapsed time between the relevant telephone calls is consistent with Jesus having gone directly from his work to the residence without stopping anywhere along the way. (Id. at 16, 23.)

[7] All three calls between the CI and Jesus were witnessed by law enforcement officers and recorded on equipment that was in good working order. (Tr. 12-13.) According to SA Beard, the information he heard in these calls corroborated what the CI had been telling him about his dealings with Jesus. (Id. at 13.)

4

Beard had previously observed Jesus sell cocaine to the CI.  (Id. at 11-13; see also note 3, supra.)

### B.    The Traffic Stop

SA Beard's initial plan was to allow Jesus to travel to the Marathon station, where officers would approach him and search his vehicle.  (Tr. 26, 28.)  However, SA Beard considered that the Marathon's parking lot is busy, and that apprehending a suspect there might create a safety hazard.  (Id.)  Moreover, that initial plan could jeopardize the identity of the CI.  (Id.)  Therefore, law enforcement elected to conduct a traffic stop on Jesus's vehicle before he arrived at the Marathon if he committed a violation of the law.  (Id. at 26, 28, 30-31.)  Officers wanted to provide the appearance that Jesus had been detained in a random traffic stop by a marked patrol unit.  (Id. at 29, 32.)

Major Tom Ewing of the Floyd County Police Department received a call between 2:15 and 2:30 p.m. from one of the officers of the Rome/Floyd Metro Drug Task Force who were following Jesus's vehicle as he drove from Calhoun on Georgia Highway 53 toward the Floyd County line.[8]  (Tr. 38, 43, 45.)  The officer

---

[8] Deputy Brad Smith of the Floyd County Sheriff's Department was riding with Major Ewing that day.  (Tr. 39, 44-45, 55.)  Major Ewing testified that he had no information that the suspect vehicle was involved in drug activity, but when he

AO 72A
(Rev.8/82)

reported that he believed they were following a drunk driver, as the vehicle had crossed the road's fog line three times.  (Id. at 38-39, 43, 46.)[9]  That officer, who knew Major Ewing was in the area, gave him a description of Jesus's vehicle (a black Dodge Neon) and its tag number.  (Id. at 38-39.)  That officer did not instruct Major Ewing to stop Jesus's vehicle.  (Id. at 54.)

Major Ewing proceeded to a spot on Georgia Highway 53 near the Floyd County line to await Jesus's arrival.  (Tr. 38-39, 45-46.)  Major Ewing pulled his marked vehicle in behind Jesus' car, and noticed it weave in its lane and get close to the fog line; thus, he initiated a traffic stop to determine if the driver was operating his vehicle under the influence.  (Id. at 15, 39, 46, 48.)  A camera in Major Ewing's vehicle captured a video of this traffic stop.  (Id. at 47; DVD in record as Def. Ex. 1.)[10]  Where relevant, the Court will reference time stamps from the video.  The

_____

receives a call from the Drug Task Force, he assumes that drugs are involved.  (Id. at 43, 45, 54.)

[9] The Drug Task Force officers following Jesus were in an unmarked vehicle and could not make a traffic stop themselves.  (Tr. 46.)  The record does not disclose positively which officer saw Jesus thrice cross the fog line.

[10] The video image taken from a camera mounted in Major Ewing's car is small, and the distance between his car and Jesus's vehicle was great (at least initially); thus, it is difficult for the Court to determine independently whether Jesus's vehicle weaved in its lane as asserted by Major Ewing.  However, the Court

6

video shows Major Ewing's patrol car following Jesus's vehicle, which came to a stop along the shoulder on Highway 53 at about 14:42:14 (or 2:42 p.m.).  A few seconds later, Major Ewing exited his vehicle and made his first encounter with Jesus.  (See video time stamp 14:42:30.)

Major Ewing approached the driver's side of Jesus's vehicle while Deputy Smith went to the passenger's side; the Major asked Jesus for his license and insurance, informed Jesus that he had received a call about a driver weaving, inquired whether he had been drinking, and asked him to exit the vehicle so that he could conduct a field sobriety test. (Tr. 19, 34, 40, 50, 52-53, 55; see also video time stamp 14:44:45.)[11] Major Ewing did not inform Jesus that he had been seen weaving within his lane.  (Tr. 55.)

---

has no reason to doubt Major Ewing's veracity, and Jesus did not testify to the contrary.  Thus, the Court accepts Major Ewing's testimony that he saw Jesus's vehicle weave in its lane.

[11] A field sobriety test measures a driver's dexterity and motor skills to assist in determining whether he is under the influence of drugs or alcohol.  (Tr. 41.) Major Ewing testified that he elected to conduct the field sobriety test because of the report from his fellow officer that the driver had crossed the fog line three times and his own observation of Jesus's car weaving in its lane.  (Id. at 41, 48-49, 50.) Morever, when he encountered the driver, Major Ewing stated that he was nervous, fumbled with his keys, and refused to make eye contact with him.  (Id. at 41.)

7

As the Major was starting that field sobriety test, Floyd County Police Officer John Koehler arrived at the scene with his K-9 partner, Lou.  (Tr. 15, 19, 31, 40, 50, 55-56, 62; see also video time stamp 14:45:26.)[12]  Officer Koehler inquired whether officers had opened the driver's side door and learned that the driver had left it open when he exited the vehicle.  (Tr. 40, 60, 65, 68, 73; see also video time stamp 14:44:41.)[13]  No one asked Jesus for consent to search his vehicle.  (Tr. 31, 75.)

Officer Koehler led Lou from his vehicle (a black, unmarked Dodge Charger) to the front passenger's side headlight of Jesus's car.  (Tr. 65-66.)  He gave Lou the search command, and as they walked around the front of the car to the open driver's

---

[12] Major Ewing did not call Officer Koehler to bring his K-9; he did not know the K-9 officer was in the area and that he would come to the scene of the traffic stop.  (Tr. 50-51.)  However, Major Ewing did not believe Officer Koehler's appearance at the scene was unusual, as he had come to traffic stops in the past with his K-9.  (Id. at 51, 56.)  Officer Koehler testified that he was familiar with the DEA's investigation, and that he had been asked by SA Beard to be on standby to assist with a possible traffic stop by running his K-9 around the vehicle.  (Id. at 63-64, 70; see also id. at 28.)  Thus, Officer Koehler was monitoring police radio; when he heard that Major Ewing had stopped the suspect vehicle, he immediately drove to that location.  (Id. at 65, 70-71.)

[13] As reflected in the above citations, Major Ewing testified that Officer Koehler asked him about the driver's door, but Officer Koehler recalled asking Deputy Smith.  Because the video shows that Major Ewing was busy conducting a field sobriety test on Jesus, Deputy Smith likely answered Officer Koehler's question.  However, any discrepancy in recollection here is not material.

side door, the K-9 jumped directly into Jesus's vehicle, placed his nose down into the console between the front passenger seats, and alerted to the presence of drugs by scratching with his paw.  (Id. at 19, 31, 40, 66-67, 69, 75, 81; see also video time stamp 14:46:00 (apparent entry by dog into vehicle).)[14]  Officer Koehler then nudged Lou into the front passenger's seat, lifted up the console, and saw two screws holding it in place were missing.  (Id. at 67-68.)  As he pulled up on the console, he could see down inside and spotted a blue plastic bag.  (Id. at 68-69.)  From his experience, Officer Koehler believed that the bag contained drugs.  (Id. at 69-70.)  Officer Koehler then signaled to Deputy Smith to have Jesus arrested.  (Id. at 70.)

Upon receiving the arrest notice from Officer Koehler (relayed through Deputy Smith), Major Ewing ceased the field sobriety test, arrested Jesus, placed him in handcuffs, conducted a cursory pat down of his person to search for weapons, and placed him in the back of his marked police vehicle.  (Tr. 40-41, 49-50, 55, 57-58; see also video time stamp 14:46:33.)  Major Ewing did not inform Jesus of the reason for his arrest.  (Id. at 58.)  Jesus was transported to the Floyd County Jail.  (Id.

---

[14] Information about Officer Kohler's experience as a K-9 handler and trainer and Lou's training, certification, and statistics is in the record.  (Tr. 62-63, 76-79.) The Court does not summarize this information because defendants do not challenge either Officer Kohler or Lou's qualifications.

9

at 18-19, 42; <u>see also</u> video time stamp 15:00:25 (departure from scene of traffic stop).)  Major Ewing did not issue a traffic citation to Jesus; he testified that, given the reason for the defendant's arrest, a traffic citation was the "least of his worries." (Tr. 42, 51; <u>see also</u> <u>id.</u> at 31-32.)[15]

Officers used an electric screwdriver found in Jesus's car to remove the consol and located a quarter kilogram of cocaine secreted therein.  (Tr. 14-15.)  The amount seized was consistent with what the CI had ordered from Jesus at the direction of SA Beard.  (<u>Id.</u> at 15, 18.)

C.    **The Search of the Residence**

Following the aforementioned traffic stop, SA Beard traveled to the Resaca Lafayette Road residence and spoke to two persons, Luce Maria Asapalo and Felipe.[16]  (Tr. 16.)  When these persons refused a request for consent to search, SA Beard consulted the office of the United States Attorney and obtained a search warrant for that residence from the undersigned.  (<u>Id.</u>)

_____

[15] There is no constitutional requirement that a police officer issue a citation for a traffic offense.  <u>United States v. Woods</u>, 385 F. App'x 914, 917 (11th Cir. 2010) (per curiam).

[16] This was SA Beard's first contact with Felipe.  (Tr. 21.)  Before October 14, 2010, the Resaca Lafayette Road residence had not been the focus of law enforcement's attention.  (<u>Id.</u>)

A search pursuant to that warrant revealed several small packages of cocaine and a handgun in the master bedroom.  (Tr. 16-17.)  However, the bulk of the evidence was seized from a hiding place in a washing machine or dryer located in an enclosed garage on the property.  (Id.)[17]  Agents also found a digital scale, and inside a pick-up truck tool box stored in the garage, agents located two money counters and a green, kilogram-sized package of cocaine.  (Id. at 17-18.)

## II.   THE INDICTMENT

The case was initially instituted through a criminal complaint [1].  Thereafter, on November 16, 2010, the Grand Jury returned a multi-count Indictment [15] against Jesus and Felipe.  Count One alleges that defendants, and others known and unknown to the grand jury, conspired to distribute and possess with intent to distribute a controlled substance (i.e., at least 500 grams of cocaine, a Schedule II controlled substance) in violation 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii), and 846.  (Id. at 1.)  Count Two alleges that defendants knowingly and intentionally possessed with intent to distribute at least five hundred grams of cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii) and 18 U.S.C. § 2.  (Id. at 2.)  Count Three asserts that

---

[17] The quarter-kilogram of cocaine seized from Jesus in the traffic stop was packaged in a manner consistent with quarter-kilogram cocaine packages located in the garage of the Resaca Lafayette Road residence.  (Tr. 17-18.)

Felipe knowingly possessed a firearm in furtherance of a drug trafficking crime (i.e., the offenses alleged in Counts One and Two) in violation of 18 U.S.C. §§ 924(c) and 2. (Id.)  In Count Four, the Indictment alleges that Felipe, having previously been convicted of a felony, knowingly possessed a firearm (in and affecting interstate commerce) in violation of 18 U.S.C. §§ 922(g)(1) and 924(a). (Id. at 2-3.)  In Count Five of the Indictment, the grand jury charges that Felipe, being an alien unlawfully and illegally in the United States, possessed in and affecting commerce a firearm in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2). (Id. at 3.)  Through Count Six, the Indictment alleges that Felipe managed and controlled a place (i.e., 3230 Resaca Lafayette Road, Sugar Valley, Gordon County, Georgia) as an occupant, and knowingly and intentionally made such place available for use for the purpose of storing, distributing, and using controlled substances, all in violation of 21 U.S.C. § 856(a)(2). (Id.)  Finally, Count Seven of the Indictment charges Felipe with illegal re-entry in violation of 8 U.S.C. §§ 1326(a) and (b)(2). (Id. at 4.)  The Indictment contains a forfeiture provision. (Id. at 4-6.)

## III.   **CONTENTIONS OF THE PARTIES**

Jesus first contends that the initial stop of his vehicle and its subsequent search are invalid as pretextual, lacking both reasonable suspicion and probable cause.

12

(Jesus's Mot. to Suppress Br. [51] 5-8.)   Second, he asserts that the search and seizure of evidence following the traffic stop were not reasonably related to the circumstances of the stop and did not comply with the requirements of Terry v. Ohio, 392 U.S. 1 (1968). (Id. at 8-11.)   Finally, Jesus argues that the search of his vehicle was illegal, because it was unsupported by probable cause; thus, all evidence seized therein must suppressed. (Id. at 11-13.)   Felipe echoes Jesus's three arguments about the vehicle stop and search (see Felipe's Mot. to Suppress Br. [52] 6-14), but he makes an additional argument about the search of his residence on Resaca Lafayette Road.   Specifically, Felipe contends that, because the traffic stop and resulting seizure and search of Jesus's vehicle was invalid, there was no probable cause to support the search warrant issued for his residence; thus, he argues that any evidence seized from his residence must be suppressed. (Id. at 15-17.)

The Government responds that officers had probable cause to stop the vehicle Jesus was driving given their surveillance of his drug trafficking activities, the recorded calls between the CI and Jesus concerning drug transactions, and his failure to maintain lane. (Gov't Resp. [54] 2.)   Moreover, only four minutes elapsed from inception of the traffic stop to K-9 Lou's indication that narcotics were present–providing probable cause to search Jesus's vehicle. (Id.)   As for Felipe,

13

because he was not a passenger in Jesus's vehicle, the Government argues that he has no basis to challenge its stop.  (Id.)  Moreover, because the search of Jesus's vehicle did not implicate Felipe's Fourth Amendment rights, he also lacks standing to contest the search.[18]   (Id.)   As for the search warrant for the residence, the Government asserts that Felipe failed to make the substantial preliminary showing which would entitle him to a hearing under Franks v. Delaware, 438 U.S. 154 (1978).[19]  (Id. at 2-3.)

## IV.   ANALYSIS

### A.   Legality of the Traffic Stop

Law enforcement may briefly detain a person for an investigatory stop "if they have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity."  United States v. Powell, 222

---

[18] Because the law is clear that Felipe has no standing to contest either the stop or the search of Jesus's car, the Court will not consider this issue infra.  See Rakas v. Illinois, 439 U.S. 128, 133-36, 148 (1978); United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir. 1998).

[19] In Franks, the Supreme Court held that, where a defendant makes a substantial preliminary showing that an affidavit for a search warrant includes a false statement made knowingly and intentionally, or with reckless disregard for the truth, and where the false statement is necessary to a finding of probable cause, the defendant is entitled to a hearing to determine whether the evidence seized during the execution of that warrant should be admitted at trial.  438 U.S. at 171-72.

AO 72A
(Rev.8/82)

F.3d 913, 917 (11th Cir. 2000) (suppression of evidence seized in traffic stop reversed because appellant twice stopped, in a short period of time, at known drug dealer's house and entered house carrying a backpack each time).  A reasonable suspicion must arise from the totality of circumstances, including both illegal and otherwise innocent activity.  Id. at 917-18.  When examining the totality of circumstances to determine whether law enforcement had a reasonable, articulable suspicion that the person had or was about to engage in criminal activity, the court must evaluate "all the facts and circumstances within the collective knowledge of the law enforcement officers." United States v. Hastamorir, 881 F.2d 1551, 1556 (11th Cir. 1989); United States v. Glinton, 154 F.3d 1245 (11th Cir. 1998) (reasonable suspicion for traffic stop determined from collective knowledge of law enforcement).

Based upon the agents' surveillance and knowledge of Jesus's drug trafficking activities, agents suspected that he had arranged a drug transaction with the CI and was about to make delivery.  Although all the officers and agents personally did not have comprehensive knowledge of the investigation, it was within the collective knowledge of law enforcement.  Accordingly, there was a reasonable, articulable

15

suspicion that Jesus had just engaged in, and was about to further engage in, criminal activity, thus justifying the traffic stop.  See Powell, 222 F.3d at 917.

Additionally, "[t]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996); see also United States v. Purcell, 236 F.3d 1274, 1276 & n.5 (11th Cir. 2001) (finding probable cause for traffic stop where police officer reasonably believed driver was following too closely in violation of traffic law).  Probable cause must be supported by more than a mere suspicion, but does not require the same "'standard of conclusiveness and probability as the facts necessary to support a conviction.'"  United States v. Dunn, 345 F.3d 1285, 1290 (11th Cir. 2003) (quoting Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002)).  Finally, the propriety of the traffic stop does not depend on whether the defendant is actually guilty of committing a traffic offense.  United States v. Chanthasouxat, 342 F.3d 1271, 1277-79 (11th Cir. 2003).  Instead, the pertinent question is whether it was reasonable for the officer to believe that a traffic offense had been committed.  Id.

In the instant case, the evidence presented at the hearing demonstrates that probable cause existed for the traffic stop.  An unknown officer had reported to

AO 72A
(Rev.8/82)

Major Ewing that he had seen the vehicle driven by Jesus cross over the fog line three times, which indicated possible intoxication.  Morever, Major Ewing testified that he witnessed the car driven by Jesus weave in its lane.  The Court finds this testimony credible.  (See supra note 10.)  A police officer has probable cause to stop a driver whose car is weaving in its lane.[20]  United States v. Baugh, 71 F. Supp. 2d 1375, 1377 (M.D. Ga. 1999); see also United States v. Garcia, 284 F. App'x 791, 793 (11th Cir. 2008) (per curiam) (failure to maintain lane provides probable cause for vehicle stop).  Moreover, under Whren v. United States, 517 U.S. 806 (1996), once he witnessed a violation of the state's traffic laws, Major Ewing's stop of Jesus's vehicle was appropriate regardless of any "pretextual" motivations.  Id. at

---

[20] The relevant statute provides as follows:

Whenever any roadway has been divided into two or more clearly marked lanes for traffic, the following rules, in addition to all others consistent with this Code section, shall apply:

(1)   A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety[.]

O.C.G.A. § 40-6-48(1).

17

813.  In other words, it matters not that the DEA or Dug Task Force agents wanted the vehicle stopped.[21]

### B.    Detention and Search of the Vehicle

The Fourth Amendment protects individuals from unreasonable search and seizure.[22]  A traffic stop is a seizure within the meaning of the Fourth Amendment. Delaware v. Prouse, 440 U.S. 648, 653 (1979).  Because a routine traffic stop is only a limited form of seizure, it is more analogous to an investigative detention than to a custodial arrest.  Berkemer v. McCarty, 468 U.S. 420, 439 (1984).  Therefore, courts analyze the legality of these stops under the standard articulated in Terry v. Ohio.  See United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990).

Under Terry, an officer' s actions during a traffic stop must be "reasonably related in scope to the circumstances which justified the interference in the first place."  392 U.S. at 20.  Furthermore, the duration of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop.  United States v. Pruitt,

─────────────────────

[21] It is also immaterial to the probable cause determination that Major Ewing never issued a citation to Jesus.  United States v. Monzon-Gomez, 244 F. App'x 954, 959 n.4 (11th Cir. 2007) (per curiam).

[22] The Fourth Amendment provides in relevant part as follows:  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.

174 F.3d 1215, 1219-20 (11th Cir. 1999).  During a stop, an officer may prolong the detention to investigate the driver's license and the vehicle registration, and may do so by requesting a computer check.  See Purcell, 236 F.3d at 1278; United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999).  The officer also may remove the driver from the vehicle.  Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977) (per curiam).  Moreover, in the interest of safety, an officer may "pat down" a suspect for weapons.  Terry, 392 U.S. at 24.

A traffic stop, however, may not last "any longer than necessary to process the traffic violation" unless there is articulable suspicion of other illegal activity.  United States v. Holloman, 113 F.3d 192, 196 (11th Cir. 1997) (per curiam); see also Pruitt, 174 F.3d at 1219 (stating that "once an officer has briefly stopped a motor vehicle operator for the purpose of issuing a traffic violation (i.e., a ticket), the officer's continuing detention of the vehicle's occupants is authorized under the Fourth Amendment only if the officer can point to 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.'") (quoting United States v. Griffin, 109 F.3d 706, 708 (11th Cir. 1997) (per curiam)).  In other words, where an initial traffic stop is legal, an officer has "'the duty to investigate suspicious circumstances that then [come] to his attention.'"

19

United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991) (quoting United States

v. Hardy, 855 F.2d 753, 757 (11th Cir. 1988)).

Additionally, police are allowed to employ drug-sniffing dogs during a lawful

traffic stop.  Illinois v. Caballes, 543 U.S. 405, 408-09 (2005); accord United States

v. Tamari, 454 F.3d 1259, 1265 n.6 (11th Cir. 2006) ("a drug sniff performed during

a lawful traffic stop is not a search implicating Fourth Amendment concerns").  In

a subsequent decision, Muehler v. Mena, 544 U.S. 93 (2005), the Supreme Court

made the following relevant comments about Caballes:

> Our recent opinion in Illinois v. Caballes, 543 U.S. 405, 125 S. Ct. 834,
> 160 L.Ed.2d 842 (2005), is instructive.  There, we held that a dog sniff
> performed during a traffic stop does not violate the Fourth Amendment.
> We noted that a lawful seizure "can become unlawful if it is prolonged
> beyond the time reasonably required to complete that mission," but
> accepted the state court's determination that the duration of the stop
> was not extended by the dog sniff.  Id., at 407, 125 S. Ct., at 836-838.
> Because we held that a dog sniff was not a search subject to the Fourth
> Amendment, we rejected the notion that "the shift in purpose" "from a
> lawful traffic stop into a drug investigation" was unlawful because it
> "was not supported by any reasonable suspicion."  Id., at 408, 125 S.
> Ct., at 837-838.

Muehler, 544 U.S. at 101; see also United States v. Morales-Zamora, 914 F.2d 200,

202-03 (10th Cir. 1990) (holding that no individualized reasonable suspicion of

drug-related crime is required when dog sniff is employed during lawful detention of vehicle).

### 1.     Length of Detention

Here, the traffic stop lasted about four minutes from the time the car driven by Jesus pulled off the road until his arrest.  The record shows that Major Ewing initiated the traffic stop at about 2:42 p.m.  At about 2:45 p.m., as the Major was occupied with administering a field sobriety test to Jesus, Officer Kohler used K-9 Lou to walk around the Dodge Neon.  K-9 Lou indicated the presence of narcotics in Jesus's vehicle at about 2:46 p.m.  Office Koehler then gave an arrest signal, and Major Ewing stopped the field sobriety test (i.e., the reason for the stop) and placed the defendant under arrest at 2:46 p.m.  Four minutes is not an unreasonable amount of time for a traffic stop.  See Purcell, 236 F.3d at 1279 (approving fourteen-minute traffic stop); United States v. Shareef, 100 F.3d 1491, 1501-02 (10th Cir. 1996) (holding thirty minute wait for computer check during traffic stop reasonable); Hardy, 855 F.2d at 761(approving fifty-minute traffic stop).

Additionally, Officer Koheler's decision to employ K-9 Lou was permissible and did not improperly prolong the stop.  See Caballes, 543 U.S. at 408 (holding that dog sniff alone does not change character of lawful traffic stop unless executed in

unreasonable or unconstitutional manner).  K-9 Lou was on the scene; therefore, defendant was not required to wait for the arrival of a K-9 unit.  See United States v. Holloman, 113 F.3d 192, 196 (11th Cir. 1997) (per curiam) (holding duration of detention constitutional where defendant was stopped for traffic infraction and drug dog walked around vehicle while police performed routine license check).  Officer Koehler used K-9 Lou to conduct a free air sniff within three minutes of law enforcement's first contacting Jesus; this act was not a search and did not unreasonably prolong the traffic stop (because it occurred roughly at the inception of the stop).   Given the above-cited decisions in Caballes, Muehler, and Morales-Zamora, the fact that Major Ewing shifted his purpose from making inquiry about drunk driving during a lawful traffic stop to a drug investigation without reasonable suspicion is immaterial.  The Court therefore concludes that the duration of the traffic stop was not unreasonable or illegally prolonged under the totality of the circumstances.

AO 72A
(Rev.8/82)

### 2.   <u>Search of the Vehicle</u>

When a trained canine gives a positive alert to a vehicle, probable cause exists to conduct a search without a warrant.[23]  <u>United States v. Porter</u>, 221 F. App'x 836, 840 (11th Cir. 2007) (per curiam) (canine sniff, coming only nine minutes into traffic stop, revealed presence of drugs, giving officers probable cause for warrantless search); <u>Tamari</u>, 454 F.3d at 1264-65 (drug dog's positive alert was sufficient to give agents probable cause to search vehicle without warrant); <u>United States v. Banks</u>, 3 F.3d 399, 402 (11th Cir. 1993) (per curiam) (dog sniff provided requisite probable cause for warrantless search).  In <u>Caballes</u>, the Supreme Court explained that a sniff by a well-trained narcotics-detection dog is treated "'*sui generis*' because it 'discloses only the presence or absence of narcotics, a contraband item.'"  543 U.S. at 409 (quoting <u>United States v. Place</u>, 462 U.S. 696, 707 (1983)).  The <u>Caballes</u>

---

[23] Under the automobile exception, the police can make a warrantless search of a vehicle that is readily movable where probable cause exists to believe that the vehicle contains contraband. <u>Pennsylvania v. Labron</u>, 518 U.S. 938, 940 (1996) (per curiam); <u>United States v. Watts</u>, 329 F.3d 1282, 1286 (11th Cir. 2003) (per curiam). Probable cause exists when, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle. <u>Tamari</u>, 454 F.3d at 1264.

court also noted that the trial judge in that case found the dog sniff was sufficiently reliable to establish probable cause for a search.  Id. at 409.[24]

The Court concludes that K-9 Lou is a well-trained narcotics-detection dog, and that his final indication (signaling that he detected the odor of narcotics in the Neon's console) was sufficient probable cause to search the vehicle.  (Indeed, defendants do not challenge K-9 Lou's reliability.)  It matters not that Lou did not signal on the outside of the vehicle but entered through the door Jesus had left open when he exited the vehicle.  See United States v. Pierce, 622 F.3d 209, 212-13 (3d Cir. 2010) (drug-sniffing dog's entry into defendant's vehicle did not constitute an illegal warrantless search, where the dog entered the vehicle through a door that had been left open by defendant and the dog's handler did not facilitate that entry); United States v. Vasquez, 555 F.3d 923, 930 (10th Cir. 2009) (if drug dog breaches

_____

[24] Although the Eleventh Circuit has not discussed the issue of a drug dog's reliability extensively, it did state that "[t]wo other circuits have held that training of a dog alone is sufficient proof of reliability.  United States v. Venema, 563 F.2d 1003, 1005 (10th Cir. 1977); United States v. Meyer, 536 F.2d 963, 965-66 (1st Cir. 1976).  We endorse the views of those circuits."  United States v. Sentovich, 677 F.2d 834, 837 n.8 (11th Cir. 1982); see also United States v. Anderson, 367 F. App'x 30, 32 (11th Cir. 2010) (per curiam) ("While a dog sniff must be sufficiently reliable in order to establish probable cause, we have held in dicta 'that training of a dog alone is sufficient proof of reliability.'  United States v. Sentovich, 677 F.2d 834, 838 n.8 (11th Cir. 1982).").

24

interior of a vehicle during a sniff, no Fourth Amendment violation if dog acted instinctually and entered due to the an act of an occupant rather than the police officer); United States v. Stone, 866 F.2d 359, 363 (10th Cir. 1989) (where defendant voluntarily opened hatchback of his car and then left it open, the subsequent unsolicited entry of a drug dog into the hatchback was not a search).   Therefore, the cocaine discovered during the stop and subsequent search of Jesus's vehicle following the alert of K-9 Lou should not be suppressed.

### C.    Search of the Residence

Based on the evidence seized during the aforementioned traffic stop, SA Beard obtained a search warrant from the undersigned for the Resaca Lafayette Road residence.   The Court agrees with the Government that Felipe failed to make the substantial preliminary showing necessary to obtain a Franks hearing.   Indeed, the evidentiary record shows that the statements the agent made in the affidavit supporting the search warrant application were not false or made with a reckless disregard for the truth.   Given that Jesus went to the residence and left quickly after telephone conversations with a CI interested in purchasing drugs, there was probable cause to believe that he used that location to store the illegal drugs that he was selling.   Thus, the evidence seized in Felipe's residence need not be suppressed.

25

## V.   **CONCLUSION**

For the reasons stated above, the undersigned **RECOMMENDS** that

defendants' Motions to Suppress [28, 29] be **DENIED**.

**SO RECOMMENDED**, this 20th day of June, 2011.


_____
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

26

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

v.

JESUS RAMON SICAIROS-SICAIROS
and FELIPE SICAIROS-SICAIROS,

Defendants.

CRIMINAL ACTION FILE NO.

4:10-CR-054-HLM-WEJ

**ORDER FOR SERVICE OF
NON-FINAL REPORT AND RECOMMENDATION**

Let this Non-Final Report and Recommendation of the United States

Magistrate Judge, made in accordance with 28 U.S.C. § 636(b)(1)(B) and the Court's

Local Criminal Rule 58.1(A)(3)(a), be filed and a copy, together with a copy of this

Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if

any, to the Non-Final Report and Recommendation within fourteen days of the

receipt of this Order.  Should objections be filed, they shall specify with particularity

the alleged error(s) made (including reference by page number to any transcripts if

applicable) and shall be served upon the opposing party.  The party filing objections

will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court.  Failure to object to this Non-Final Report and Recommendation waives a party's right to review.  Fed. R. Crim. P. 58(b)(2).

The Clerk is directed to submit the Non-Final Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**SO ORDERED**, this 20th day of June, 2011.


WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

2