IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL ACTION FILE NO. |
| JESUS RAMON SICAIROS-SICAIROS and FELIPE SICAIROS-SICAIROS. | 4:10-CR-054-HLM |

## ORDER

This case is before the Court on Defendant Jesus Sicairos-Sicairos's Motion to Suppress [28], on Defendant Felipe Sicairos-Sicairos's Motion to Suppress [29], and on the Non-Final Report and Recommendation of United States Magistrate Judge Walter E. Johnson [55].

## I.    Standard of Review

O 72A
(ev.8/82)

28 U.S.C.A. § 636(b)(1) requires that, in reviewing a magistrate judge's report and recommendation, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C.A. § 636(b)(1).  The Court therefore must conduct a <u>de novo</u> review if a party files "a proper, specific objection" to a factual finding contained in the report and recommendation. <u>Macort v. Prem, Inc.</u>, 208 F. App'x 781, 784 (11th Cir. 2006); <u>Jeffrey S. by Ernest S. v. State Bd. of Educ.</u>, 896 F.2d 507, 513 (11th Cir. 1990); <u>United States v. Gaddy</u>, 894 F.2d 1307, 1315 (11th Cir. 1990); <u>LoConte v. Dugger</u>, 847 F.2d 745, 750 (11th Cir. 1988).  If no party files a timely objection to a factual finding in the report and

2

recommendation, the Court reviews that finding for clear error.  Macort, 208 F. App'x at 784.  Legal conclusions, of course, are subject to de novo review regardless of whether a party specifically objects.  United States v. Keel, 164 F. App'x 958, 961 (11th Cir. 2006); United States v. Warren, 687 F.2d 347, 347 (11th Cir. 1982).

## II.   Background

### A.   Factual Background

#### 1.   The Investigation

During the summer of 2010, Drug Enforcement Administration ("DEA") Special Agent ("SA") Terry Beard developed a confidential informant ("CI") in the course of working another case who identified Defendant Jesus Sicairos-Sicairos as his source of supply for quarter-

3

AO 72A
(Rev.8/82)

kilogram quantities of cocaine. (Tr. at 6-7, 23.)[1] As a result,

Defendant Jesus Ramon Sicairos-Sicairos became the

target of a DEA investigation. (Id. at 9.) Conasauga Drug

Task Force officers subsequently developed information

concerning addresses associated with Defendant Jesus

Ramon Sicairos-Sicairos.    (Id. at 10, 21-22.)    At

approximately 10:00 a.m. on October 14, 2010, officers

established surveillance at a residence located at 3230

Resaca Lafayette Road, which is north of Calhoun, Georgia.

---

[1] SA Beard testified that he took steps to corroborate the information received from the CI, including checking the telephone number provided by the CI and confirming that Defendant Jesus Ramon Sicairos-Sicairos was the subscriber for that number. (Tr. at 7-8.) The CI also outlined how most of his drug transactions with Defendant Jesus Ramon Sicairos-Sicairos had occurred, and SA Beard confirmed that information by observing their meetings at a Marathon gas station, one of which was videotaped. (Id. at 8, 24-25.) SA Beard obtained permission from a judge to use the CI; however, the judge only allowed the CI to make telephone calls. (Id. at 9, 26.)

4

(Id.)  Law enforcement assumed that Defendant Jesus Ramon Sicairos-Sicairos would have to travel somewhere to pick up the drugs ordered by the CI, so they began surveillance at that residence.  (Id. at 21-22.)  As discussed below, officers maintained surveillance there until approximately 2:19 p.m.  (Id. at 10-11.)

At approximately 1:40 p.m., SA Beard instructed the CI to place a recorded telephone call to Defendant Jesus Ramon Sicairos-Sicairos and order one-quarter kilogram of cocaine for $8,200.  (Tr. at 9, 11.)  Defendant Jesus Ramon Sicairos-Sicairos replied that he was at work, and that he would try to get off and call the CI back later.  (Id. at 10.)  About seven minutes later, or at approximately 1:47 p.m., Defendant Jesus Ramon Sicairos-Sicairos called the CI,

5

and in a recorded conversation stated that Defendant Jesus Ramon Sicairos-Sicairos would call the CI back in about fifteen minutes and then give the CI fifteen minutes' notice before meeting with the CI to consummate the drug transaction. (Id. at 10-11.) This proposed schedule was consistent with other transactions that had occurred between the CI and Defendant Jesus Ramon Sicairos-Sicairos. According to the CI, if Defendant Jesus Ramon Sicairos-Sicairos had the cocaine, he would meet the CI within fifteen minutes of a call; however, it could take an hour for Defendant Jesus Ramon Sicairos-Sicairos to meet with the CI if he had to go get the cocaine. (Id. at 11.)[2] The

_____

[2] The CI had also informed SA Beard that Defendant Jesus Ramon Sicairos-Sicairos usually secreted the cocaine in a void in the center console of his car's front seat and used an electric screwdriver he kept in the car to remove the screws and retrieve

6

CI also relayed that Defendant Jesus Ramon Sicairos-Sicairos had two sources of supply: (1) an individual in Dalton; and (2) his brother, Defendant Felipe Sicairos-Sicairos, who lived in Calhoun. (Id.)

At approximately 2:05 p.m., surveillance agents at the Resaca Lafayette Road residence observed Defendant Jesus Ramon Sicairos-Sicairos arrive and pull his vehicle into the driveway. (Tr. at 11.) Defendant Jesus Ramon Sicairos-Sicairos left about 2:19 p.m., and task force agents followed him. (Id.)[3] SA Beard testified that officers maintained continuous surveillance on the car driven by

---

the drugs. (Tr. at 12.)

[3]SA Beard conceded that his investigation tied Defendant Jesus Ramon Sicairos-Sicairos to the Resaca Lafayette Road residence for only those few minutes--2:05 through 2:19 p.m. on October 14, 2010. (Tr. at 21-22.)

Defendant Jesus Ramon Sicairos-Sicairos from the time it left the residence until it was involved in the traffic stop discussed below.  (Id. at 13-14, 16, 20, 33.)[4]

Shortly after he left the residence, Defendant Jesus Ramon Sicairos-Sicairos called the CI and told the CI that they should meet in fifteen minutes.  (Tr. at 11, 16.)  In response to the CI's question about where they should meet, Defendant Jesus Ramon Sicairos-Sicairos answered, "Where I work."  (Id. at 11.)[5]  This work location, Church

---

[4]Agents did not follow Defendant Jesus Ramon Sicairos-Sicairos from his work location, Church Chair Industries, to the Resaca Lafayette Road residence.  (Tr. at 20, 23.)  SA Beard, however, testified that the elapsed time between the relevant telephone calls is consistent with Defendant Jesus Ramon Sicairos-Sicairos having gone directly from his work to the residence without stopping anywhere along the way. (Id. at 16, 23.)

[5]All three calls between the CI and Defendant Jesus Ramon Sicairos-Sicairos were witnessed by law enforcement officers and

Chair Industries, is directly across the street from the Marathon gas station where SA Beard had previously observed Defendant Jesus Ramon Sicairos-Sicairos sell cocaine to the CI. (Id. at 11-13.)

## 2.   The Traffic Stop

SA Beard initially planned to allow Defendant Jesus Ramon Sicairos-Sicairos to travel to the Marathon station, where officers would approach him and search his vehicle. (Tr. at 26, 28.)  SA Beard, however, considered that the Marathon's parking lot is busy, and that apprehending a suspect there might create a safety hazard. (Id.) Moreover, according to SA Beard, using the initial plan could

---

recorded on equipment that was in good working order. (Tr. at 12-13.) According to SA Beard, the information he heard in these calls corroborated what the CI had told him about the CI's dealings with Defendant Jesus Ramon Sicairos-Sicairos.  (Id. at 13.)

AO 72A
Rev.8/82)

jeopardize the CI's identity.  (Id.)   Law enforcement consequently decided to conduct a traffic stop on Defendant Jesus Ramon Sicairos-Sicairos's vehicle before he arrived at the Marathon if he committed a violation of the law.  (Id. at 26, 28, 30-31.)    Officers wanted to provide the appearance that Defendant Jesus Ramon Sicairos-Sicairos had been detained in a random traffic stop by a marked patrol unit.  (Id. at 29, 32.)

Between 2:15 and 2:30 p.m. on that same day, Major Tom Ewing of the Floyd County Police Department received a call from one of the officers of the Rome/Floyd Metro Drug Task Force who was following Defendant Jesus Ramon Sicairos-Sicairos's vehicle as he drove from Calhoun on

10

Georgia Highway 53 toward the Floyd County line.[6]  (Tr. at 38, 43, 45.)  The officer reported to Major Ewing that he believed the officers were following a drunk driver, as the vehicle had crossed the road's fog line three times.  (Id. at 38-39, 43, 46.)[7]  The officer, who knew Major Ewing was in the area, gave Major Ewing a description of Defendant Jesus Ramon Sicairos-Sicairos's vehicle, a black Dodge Neon, as well as the vehicle's tag number.  (Id. at 38-39.)

---

[6]Deputy Brad Smith of the Floyd County Sheriff's Department was riding with Major Ewing that day.  (Tr. at 39, 44-45, 55.) Major Ewing testified that he had no information that the suspect vehicle was involved in drug activity, but acknowledged that, when he receives a call from the Drug Task Force, he assumes that drugs are involved.  (Id. at 43, 45, 54.)

[7]The Drug Task Force officers following Defendant Jesus Ramon Sicairos-Sicairos were in an unmarked vehicle and could not make a traffic stop themselves.  (Tr. at 46.)  The record does not clearly disclose which officer saw Defendant Jesus Ramon Sicairos-Sicairos cross the fog line three times.

11

The officer did not instruct Major Ewing to stop Defendant

Jesus Ramon Sicairos-Sicairos's vehicle.  (Id. at 54.)

Major Ewing drove to a spot on Georgia Highway 53

near the Floyd County line to await Defendant Jesus Ramon

Sicairos-Sicairos's arrival.  (Tr. at 38-39, 45-46.)   Major

Ewing pulled his marked vehicle in behind Defendant Jesus

Ramon Sicairos-Sicairos' vehicle, noticed it weave in its

lane and get close to the fog line, and initiated a traffic stop

to determine if the driver was operating his vehicle under

the influence.  (Id. at 15, 39, 46, 48.)  A camera in Major

Ewing's vehicle captured a video of this traffic stop.  (Id. at

47; Def.'s Ex. 1.)[8]  The video shows Major Ewing's patrol

_____

[8]Judge Johnson noted:

The video image taken from a camera mounted in Major
Ewing's car is small, and the distance between his car

12

car following Defendant Jesus Ramon Sicairos-Sicairos's

vehicle, which came to a stop along the shoulder on

Highway 53 at about 14:42:14, or 2:42 p.m. A few seconds

later, Major Ewing exited his vehicle and had his first

encounter with Defendant Jesus Ramon Sicairos-Sicairos.

(Def.'s Ex. 1 at time stamp 14:42:30.)

---

and [Defendant Jesus Ramon Sicairos-Sicairos's] vehicle was great (at least initially); thus, it is difficult for the Court to determine independently whether [Defendant Jesus Ramon Sicairos-Sicairos's] vehicle weaved in its lane as asserted by Major Ewing. However, the Court has no reason to doubt Major Ewing's veracity, and [Defendant Jesus Ramon Sicairos-Sicairos] did not testify to the contrary. Thus, the Court accepts Major Ewing's testimony that he saw [Defendant Jesus Ramon Sicairos-Sicairos's] vehicle weave in its lane.

(Non-Final Report & Recommendation at 6-7 n.10.) The Court finds that Judge Johnson properly evaluated this evidence.

13

Major Ewing approached the driver's side of Defendant Jesus Ramon Sicairos-Sicairos's vehicle, while Deputy Smith went to the passenger's side; Major Ewing asked Defendant Jesus Ramon Sicairos-Sicairos for his license and insurance, informed Defendant Jesus Ramon Sicairos-Sicairos that he had received a call about a driver weaving, inquired whether Defendant Jesus Ramon Sicairos-Sicairos had been drinking, and asked him to exit the vehicle so that he could conduct a field sobriety test. (Tr. at 19, 34, 40, 50, 52-53, 55; Def.'s Ex. 1 at time stamp 14:44:45.)[9]  Major

---

[9]A field sobriety test measures a driver's dexterity and motor skills to assist in determining whether he is under the influence of drugs or alcohol. (Tr. at 41.) Major Ewing testified that he elected to conduct the field sobriety test because of the report from his fellow officer that the driver had crossed the fog line three times, as well as his own observation of Defendant Jesus Ramon Sicairos-Sicairos's car weaving in its lane. (Id. at 41, 48-49, 50.) Major Ewing also testified that, when he encountered   Defendant Jesus

14

Ewing did not inform Defendant Jesus Ramon Sicairos-Sicairos that officers had seen him weaving within his lane. (Tr. at 55.)

As Major Ewing began the field sobriety test, Floyd County Police Officer John Koehler arrived at the scene with his K-9 partner, Lou. (Tr. at 15, 19, 31, 40, 50, 55-56, 62; Def.'s Ex. 1 at time stamp 14:45:26.)[10]   Officer Koehler

---

Ramon Sicairos-Sicairos, he appeared nervous, fumbled with his keys, and refused to make eye contact with Major Ewing. (Id. at 41.)

[10]Major Ewing did not call Officer Koehler to bring his K-9 and Major Ewing did not know the K-9 officer was in the area and would come to the scene of the traffic stop. (Tr. at 50-51.) Major Ewing, however, did not believe Officer Koehler's appearance at the scene was unusual, as Officer Koehler previously had come to traffic stops with his K-9. (Id. at 51, 56.) Officer Koehler testified that he was familiar with the DEA's investigation, and that SA Beard had asked him to be on standby to assist with a possible traffic stop by running his K-9 around the vehicle. (Id. at 28, 63-64, 70.) Officer Koehler was monitoring police radio, and when he heard that Major Ewing had stopped the suspect vehicle, he immediately drove to the location of the stop. (Id. at 65, 70-71.)

15

inquired whether officers had opened the driver's side door
and learned that the driver had left it open when he exited
the vehicle. (Tr. at 40, 60, 65, 68, 73; Def.'s Ex. 1 at time
stamp 14:44:41.)[11]   No one asked Defendant Jesus Ramon
Sicairos-Sicairos for consent to search his vehicle. (Tr. at
31, 75.)

Officer Koehler led Lou from his vehicle, a black,
unmarked Dodge Charger, to the front passenger side
headlight of Defendant Jesus Ramon Sicairos-Sicairos's
car. (Tr. at 65-66.) Officer Koehler gave Lou the search

_____

[11]Major Ewing testified that Officer Koehler asked him about
the driver's door; however, Officer Koehler recalled asking Deputy
Smith about it. The Court agrees with Judge Johnson that,
because the video shows that Major Ewing was busy conducting a
field sobriety test on Defendant Jesus Ramon Sicairos-Sicairos,
Deputy Smith likely answered Officer Koehler's question, and also
agrees that  any discrepancy in recollection here is not material.
(Non-Final report & Recommendation at 8 n.13.)

16

command, and as they walked around the front of the car to the open driver's side door, Lou jumped directly into Defendant Jesus Ramon Sicairos-Sicairos's vehicle, placed his nose down into the console between the front passenger seats, and alerted to the presence of drugs by scratching with his paw. (Id. at 19, 31, 40, 66-67, 69, 75, 81; Def.'s Ex. 1 at time stamp 14:46:00 (showing apparent entry by dog into vehicle).)[12] Officer Koehler then nudged Lou into the front passenger's seat, lifted up the console, and saw that two screws holding it in place were missing. (Id. at 67-68.)

---

[12]Information about Officer Koehler's experience as a K-9 handler and trainer and Lou's training, certification, and statistics is in the record. (Tr. at 62-63, 76-79.) The Court agrees with Judge Johnson that, because Defendants do not challenge either Officer Koehler's or Lou's qualifications, it is unnecessary to summarize that information in this Order. (Non-Final Report & Recommendation at 9 n.14.)

AO 72A
(Rev.8/82)

As Officer Koehler pulled up on the console, he could see down inside it, and he spotted a blue plastic bag. (Id. at 68-69.) From his experience, Officer Koehler believed that the bag contained drugs. (Id. at 69-70.) Officer Koehler then signaled to Deputy Smith to have Defendant Jesus Ramon Sicairos-Sicairos arrested. (Id. at 70.)

Upon receiving the arrest notice from Officer Koehler, relayed through Deputy Smith, Major Ewing stopped the field sobriety test, arrested Defendant Jesus Ramon Sicairos-Sicairos, placed him in handcuffs, conducted a cursory pat down of his person to search for weapons, and placed him in the back of Major Ewing's marked police vehicle. (Tr. at 40-41, 49-50, 55, 57-58; Def.'s Ex. 1 at video time stamp 14:46:33.) Major Ewing did not tell

18

Defendant Jesus Ramon Sicairos-Sicairos the reason for his arrest.   (Id. at 58.)   The officers then transported Defendant Jesus Ramon Sicairos-Sicairos to the Floyd County Jail.  (Id. at 18-19, 42; Def.'s Ex. 1 at time stamp 15:00:25 (depicting departure from scene of traffic stop).) Major Ewing did not issue a traffic citation to Defendant Jesus Ramon Sicairos-Sicairos; however, Major Ewing testified that, given the reason for Defendant Jesus Ramon Sicairos-Sicairos's arrest, a traffic citation was the "least of his worries."  (Tr. at 31-32, 42, 51.)[13]

---

[13]Judge Johnson correctly observed: "There is no constitutional requirement that a police officer issue a citation for a traffic offense."  (Non-Final Report & Recommendation at 10 n.15 (quoting United States v. Woods, 385 F. App'x 914, 917 (11th Cir. 2010) (per curiam)).)

O 72A
tev.8/82)

Officers used an electric screwdriver found in Defendant Jesus Ramon Sicairos-Sicairos's car to remove the consol and located a quarter kilogram of cocaine secreted therein. (Tr. 14-15.) The amount seized was consistent with what the CI had ordered from Defendant Jesus Ramon Sicairos-Sicairos at the direction of SA Beard. (Id. at 15, 18.)

### 3.   The Search of the Residence

After the traffic stop, SA Beard traveled to the Resaca Lafayette Road residence and spoke to two individuals, Luce Maria Asapalo and Defendant Felipe Sicairos-Sicairos.[14] (Tr. at 16.) When those individuals refused SA

---

[14] This was SA Beard's first contact with Defendant Felipe Sicairos-Sicairos. (Tr. at 21.) Before October 14, 2010, the Resaca Lafayette Road residence had not been the focus of law enforcement's attention. (Id.)

20

Beard's request for consent to search, SA Beard consulted the office of the United States Attorney and obtained a search warrant for that residence from Judge Johnson. (Id.)

A search conducted pursuant to that warrant revealed several small packages of cocaine and a handgun in the master bedroom. (Tr. at 16-17.) The bulk of the evidence, however, was seized from a hiding place in a washing machine or dryer located in an enclosed garage on the property. (Id.)[15] Agents also found a digital scale, and inside a pick-up truck tool box stored in the garage, agents

---

[15]The quarter-kilogram of cocaine seized from Defendant Jesus Ramon Sicairos-Sicairos in the traffic stop was packaged in a manner consistent with the quarter-kilogram cocaine packages discovered in the garage of the Resaca Lafayette Road residence. (Tr. at 17-18.)

21

located two money counters and a green, kilogram-sized package of cocaine.  (Id. at 17-18.)

## B.   Procedural Background

On October 15, 2010, the Government obtained a criminal complaint against Defendants. (Docket Entry No. 1.)  On November 16, 2010, a federal grand jury sitting in the Northern District of Georgia returned a multi-count indictment against Defendants.   (Docket Entry No. 15.) Count One of the indictment alleges that Defendants, and others known and unknown to the grand jury, conspired to distribute and possess with intent to distribute a controlled substance, that is, at least 500 grams of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii), and 846. (Id. at 1.) Count Two of

22

the indictment alleges that Defendants knowingly and intentionally possessed with intent to distribute at least five hundred grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii) and 18 U.S.C. § 2. (Id. at 2.) Count Three of the indictment asserts that Defendant Felipe Sicairos-Sicairos knowingly possessed a firearm in furtherance of a drug trafficking crime--the offenses alleged in Counts One and Two--in violation of 18 U.S.C. §§ 924(c) and 2. (Id.) In Count Four, the indictment alleges that Defendant Felipe Sicairos-Sicairos, having previously been convicted of a felony, knowingly possessed a firearm in and affecting interstate commerce, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a). (Id. at 2-3.) Count Five of the indictment charges that Defendant Felipe Sicairos-Sicairos,

23

O 72A
Rev.8/82)

being an alien unlawfully and illegally in the United States,
possessed a firearm in and affecting commerce, in violation
of 18 U.S.C. §§ 922(g)(5) and 924(a)(2).  (Id. at 3.)  Count
Six of the indictment alleges that Defendant Felipe Sicairos-
Sicairos managed and controlled a place, 3230 Resaca
Lafayette Road, Sugar Valley, Gordon County, Georgia, as
an occupant, and knowingly and intentionally made such
place available for use for the purpose of storing,
distributing, and using controlled substances, all in violation
of 21 U.S.C. § 856(a)(2).  (Id.)  Finally, Count Seven of the
indictment charges Defendant Felipe Sicairos-Sicairos with
illegal re-entry in violation of 8 U.S.C. §§ 1326(a) and (b)(2).
(Id. at 4.)   The indictment also contains a forfeiture
provision.  (Id. at 4-6.)

24

On December 13, 2010, Defendants filed their Motions to Suppress.  (Docket Entry Nos. 28-29.)  On April 22, 2011, Judge Johnson held an evidentiary hearing to address the Motions.  (Docket Entry Nos. 44-45, 47-48.)

On June 20, 2011, Judge Johnson issued his Non-Final Report and Recommendation.   (Docket Entry No. 55.) Judge Johnson recommends that the Court deny Defendants' Motions to Suppress.

As of the date of this Order, the Clerk's docket indicates that Defendants have not filed Objections to the Non-Final Report and Recommendation.  The time period for filing Objections has expired, and the Court consequently finds that this matter is ripe for resolution.

AO 72A
(Rev.8/82)

## III.   Discussion

### A.   Legality of the Traffic Stop[16]

Law enforcement may briefly detain a person for an investigatory stop "if they have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity." United States v. Powell, 222 F.3d 913, 917 (11th Cir. 2000). This reasonable suspicion must arise from the totality of circumstances, including both illegal and otherwise innocent activity.   Id. at 917-18.   When examining the totality of circumstances to determine whether law enforcement had

---

[16]As an initial matter, Judge Johnson properly determined that Defendant Felipe Sicairos-Sicairos lacks standing to contest the stop or the search of Defendant Jesus Ramon Sicairos-Sicairo's vehicle. (Non-Final Report & Recommendation at 14 n.18.) To the extent that Defendant Felipe Sicairos-Sicairos challenges either of those events, the Court denies his Motion to Suppress.

AO 72A
Rev.8/82)

a reasonable, articulable suspicion that the person had or was about to engage in criminal activity, a court must evaluate "all the facts and circumstances within the collective knowledge of the law enforcement officers." United States v. Hastamorir, 881 F.2d 1551, 1556 (11th Cir. 1989); see also United States v. Glinton, 154 F.3d 1245, 1257 (11th Cir. 1998) (noting that reasonable suspicion for traffic stop is determined from collective knowledge of law enforcement).

As Judge Johnson noted:

Based upon the agents' surveillance and knowledge of [Defendant Jesus Ramon Sicairos-Sicairos's] drug trafficking activities, agents suspected that [Defendant Jesus Ramon Sicairos-Sicairos] had arranged a drug transaction with the CI and was about to make delivery. Although all the officers and agents personally did not have comprehensive knowledge of the investigation, it

27

was within the collective knowledge of law enforcement. Accordingly, there was a reasonable, articulable suspicion that [Defendant Jesus Ramon Sicairos-Sicairos] had just engaged in, and was about to further engage in, criminal activity, thus justifying the traffic stop.

(Non-Final Report & Recommendation at 16.)  The Court agrees with Judge Johnson that the officers, collectively, had reasonable suspicion to stop Defendant Jesus Ramon Sicairos-Sicairo's vehicle.

The Court further agrees with Judge Johnson that the officers had probable cause to believe that Defendant Jesus Ramon Sicairos-Sicairos had committed a traffic violation. (Non-Final Report & Recommendation at 16-18.)  "The decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810

28

(1996); see also United States v. Purcell, 236 F.3d 1274, 1276 & n.5 (11th Cir. 2001) (concluding probable cause existed for traffic stop where police officer reasonably believed driver was following too closely, in violation of traffic law).  Probable cause must be supported by more than a mere suspicion, but it does not require the same "'standard of conclusiveness and probability as the facts necessary to support a conviction.'" United States v. Dunn, 345 F.3d 1285, 1290 (11th Cir. 2003) (quoting Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002)).   The propriety of the traffic stop also does not depend on whether the defendant is actually guilty of committing a traffic offense.  United States v. Chanthasouxat, 342 F.3d 1271, 1277-79 (11th Cir. 2003).  Instead, the relevant question is

29

whether it was reasonable for the officer to believe that a

traffic offense had been committed.  Id.

As Judge Johnson observed:

> In the instant case, the evidence presented at the hearing demonstrates that probable cause existed for the traffic stop. An unknown officer had reported to Major Ewing that he had seen the vehicle driven by [Defendant Jesus Ramon Sicairos-Sicairos] cross over the fog line three times, which indicated possible intoxication. Morever, Major Ewing testified that he witnessed the car driven by [Defendant Jesus Ramon Sicairos-Sicairos] weave in its lane.  The Court finds this testimony credible.  A police officer has probable cause to stop a driver whose car is weaving in its lane. United States v. Baugh, 71 F. Supp. 2d 1375, 1377 (M.D. Ga. 1999); see also United States v. Garcia, 284 F. App'x 791, 793 (11th Cir. 2008) (per curiam) (failure to maintain lane provides probable cause for vehicle stop). Moreover, under Whren v. United States, 517 U.S. 806 (1996), once he witnessed a violation of the state's traffic laws, Major Ewing's stop of [Defendant Jesus Ramon Sicairos-Sicairos's] vehicle was appropriate regardless of any

O 72A
Rev.8/82)

"pretextual" motivations.   Id. at 813.   In other words, it matters not that the DEA or Dug Task Force agents wanted the vehicle stopped.

(Non-Final Report & Recommendation at 18 (footnotes omitted).)   The Court finds that Judge Johnson properly evaluated the evidence and the applicable law, and concludes that probable cause existed to stop Defendant Jesus Sicairos-Sicairos's vehicle.[17]

## B.   Detention and Search of the Vehicle

The Fourth Amendment protects individuals from unreasonable searches and seizures.[18]   A traffic stop is a

---

[17]The Court also agrees with Judge Johnson that: "It is also immaterial to the probable cause determination that Major Ewing never issued a citation to" Defendant Jesus Ramon Sicairos-Sicairos.   (Non-Final Report & Recommendation at 18 n.21.)

[18]The Fourth Amendment provides, in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."   U.S. Const. amend. IV.

31

seizure within the meaning of the Fourth Amendment.
Delaware v. Prouse, 440 U.S. 648, 653 (1979).  Because a
routine traffic stop is only a limited form of seizure, it is more
analogous to an investigative detention than to a custodial
arrest.   Berkemer v. McCarty, 468 U.S. 420, 439 (1984).
Courts consequently analyze the legality of traffic stops
under the standard articulated in Terry v. Ohio, 392 U.S. 1
(1968).  See United States v. Tapia, 912 F.2d 1367, 1370
(11th Cir. 1990).

Under Terry, an officer's actions during a traffic stop
must be "reasonably related in scope to the circumstances
which justified the interference in the first place."  392 U.S.
at 20.  Additionally, the traffic stop's duration must be limited
to the time necessary to effectuate the purpose of the stop.

32

United States v. Pruitt, 174 F.3d 1215, 1219-20 (11th Cir. 1999).   During a traffic stop, an officer may prolong the detention to investigate the driver's license and the vehicle's registration, and may do so by requesting a computer check.   Purcell, 236 F.3d at 1278; United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999).  The officer also may remove the driver from the vehicle.  Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977) (per curiam). Additionally, in the interest of safety, an officer may "pat down" a suspect for weapons. Terry, 392 U.S. at 24.

A traffic stop, however, cannot last "any longer than necessary to process the traffic violation" unless the officers have articulable suspicion of other illegal activity.   United States v. Holloman, 113 F.3d 192, 196 (11th Cir. 1997) (per

33

curiam); see also Pruitt, 174 F.3d at 1219 (noting that "once

an officer has briefly stopped a motor vehicle operator for

the purpose of issuing a traffic violation (*i.e.*, a ticket), the

officer's continuing detention of the vehicle's occupants is

authorized under the Fourth Amendment only if the officer

can point to 'specific and articulable facts which, taken

together with rational inferences from those facts,

reasonably warrant the intrusion.'") (quoting United States

v. Griffin, 109 F.3d 706, 708 (11th Cir. 1997) (per curiam)).

Stated differently, where an initial traffic stop is legal, an

officer has "'the duty to investigate suspicious

circumstances that then [come] to his attention.'" United

States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991)

34

(quoting <u>United States v. Hardy</u>, 855 F.2d 753, 757 (11th Cir. 1988)).

Police may use drug-sniffing dogs during a lawful traffic stop.   <u>Illinois v. Caballes</u>, 543 U.S. 405, 408-09 (2005); <u>accord</u> <u>United States v. Tamari</u>, 454 F.3d 1259, 1265 n.6 (11th Cir. 2006) ("a drug sniff performed during a lawful traffic stop is not a search implicating Fourth Amendment concerns").   In a subsequent decision, <u>Muehler v. Mena</u>, 544 U.S. 93 (2005), the Supreme Court noted:

> Our recent opinion in <u>Illinois v. Caballes</u>, 543 U.S. 405, 125 S. Ct. 834, 160 L.Ed.2d 842 (2005), is instructive.   There, we held that a dog sniff performed during a traffic stop does not violate the Fourth Amendment.   We noted that a lawful seizure "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission," but accepted the state court's determination that the duration of the stop was not extended by the dog sniff.   <u>Id.</u> at 407, 125 S. Ct.,

> at 836-838. Because we held that a dog sniff was not a search subject to the Fourth Amendment, we rejected the notion that "the shift in purpose" "from a lawful traffic stop into a drug investigation" was unlawful because it "was not supported by any reasonable suspicion." Id., at 408, 125 S. Ct., at 837-838.

Muehler, 544 U.S. at 101; see also United States v. Morales-Zamora, 914 F.2d 200, 202-03 (10th Cir. 1990) (concluding that no individualized reasonable suspicion of drug-related crime is required when dog sniff is employed during lawful detention of vehicle).

## 1.    Length of Detention

The traffic stop at issue in this case lasted approximately four minutes from the time the vehicle driven by Defendant Jesus Ramon Sicairos-Sicairos pulled off the road until the officers arrested Defendant Jesus Ramon

36

Sicairos-Siciaros.   The record reflects that Major Ewing initiated the traffic stop at approximately 2:42 p.m.   At approximately 2:45 p.m., as Major Ewing was occupied with administering a field sobriety test to Defendant Jesus Ramon Sicairos-Sicairos, Officer Koehler used K-9 Lou to walk around the Dodge Neon.  At approximately 2:46 p.m., K-9 Lou indicated the presence of narcotics in Defendant Jesus Ramon Sicairos-Sicairos's vehicle.  Office Koehler then gave an arrest signal, and Major Ewing stopped the field sobriety test and placed Defendant Jesus Ramon Siciaros-Siciaros under arrest at approximately 2:46 p.m. The Court agrees with Judge Johnson that "[f]our minutes is not an unreasonable amount of time for a traffic stop."

37

O 72A
(Rev.8/82)

(Non-Final Report & Recommendation at 21-22 (collecting cases).)

Judge Johnson also correctly determined that Officer Koheler's decision to use K-9 Lou was permissible and did not improperly prolong the stop.    (Non-Final Report & Recommendation at 22 (citing Caballes, 543 U.S. at 408).) As Judge Johnson noted, K-9 Lou was on the scene, and Defendant Jesus Ramon Sicairos-Siciaros was not required to wait for the arrival of a K-9 unit. (Id. (citing United States v. Holloman, 113 F.3d 192, 196 (11th Cir. 1997) (per curiam)).)   The Court agrees with Judge Johnson's determination that "Officer Koehler used K-9 Lou to conduct a free air sniff within three minutes of law enforcement's first contacting Defendant Jesus Ramon Sicairos-Sicairos; this

38

act was not a search and did not unreasonably prolong the traffic stop (because it occurred roughly at the inception of the stop)." (Id.) Judge Johnson also properly found that, in light of the applicable law, "the fact that Major Ewing shifted his purpose from making inquiry about drunk driving during a lawful traffic stop to a drug investigation without reasonable suspicion is immaterial." (Id.) The Court consequently agrees with Judge Johnson that, under the totality of the circumstances, the duration of the traffic stop was not unreasonable or illegally prolonged. (Id. at 22-23.)

## 2.   Search of the Vehicle

As Judge Johnson noted, probable cause exists to conduct a search without a warrant when a trained canine

.O 72A
Rev.8/82)

gives a positive alert to a vehicle.[19]   (Non-Final Report &

Recommendation at 23 (collecting cases).)   The Supreme

Court has observed that a sniff by a well-trained narcotics-

detection dog is treated "'*sui generis*' because it 'discloses

only the presence or absence of narcotics, a contraband

item.'"   Caballes, 543 U.S. at 409 (quoting United States v.

Place, 462 U.S. 696, 707 (1983)).   In Caballes, the

Supreme Court also noted that the trial judge in that case

_____

   [19]The automobile exception allows police officers to make a
warrantless search of a vehicle that is readily movable where
probable cause exists to believe that the vehicle contains
contraband.   Pennsylvania v. Labron, 518 U.S. 938, 940 (1996)
(per curiam); United States v. Watts, 329 F.3d 1282, 1286 (11th
Cir. 2003) (per curiam).   Probable cause exists when, under the
totality of the circumstances, a fair probability exists that
contraband or evidence of a crime will be found in the vehicle.
Tamari, 454 F.3d at 1264.

40

found the dog sniff was sufficiently reliable to establish probable cause for a search.  Id. at 409.

The Court agrees with Judge Johnson's determination that "K-9 Lou is a well-trained narcotics-detection dog, and that his final indication (signaling that he detected the odor of narcotics in the Neon's console) was sufficient probable cause to search the vehicle."    (Non-Final Report & Recommendation at 24.)   Judge Johnson also properly reasoned that "[i]t matters not that Lou did not signal on the outside of the vehicle but entered through the door [Defendant Jesus Ramon Sicairos-Sicairos] had left open when he exited the vehicle."   (Id. at 24-25 (collecting cases).)  Judge Johnson therefore properly concluded that the Court should not suppress the cocaine discovered

41

during the stop and subsequent search of Defendant Jesus

Ramon Sicairos-Sicairos's vehicle following the alert of K-9

Lou.  (Id. at 25.)

### 3.    Search of the Residence

Based on the evidence seized during the traffic stop of

Defendant Jesus Ramon Sicairos-Sicairo's vehicle, SA

Beard obtained a search warrant from Judge Johnson for

the Resaca Lafayette Road residence.   Judge Johnson

properly concluded that Defendant Felipe Sicairos-Sicairos

failed to make the substantial preliminary showing

necessary to obtain a Franks hearing.  (Non-Final Report &

Recommendation at 25.)  As Judge Johnson noted, "the

evidentiary record shows that the statements the agent

made in the affidavit supporting the search warrant

42

application were not false or made with a reckless disregard for the truth." (Id.)   The Court also agrees with Judge Johnson that, because Defendant Jesus Ramon Sicairos-Sicairos went to the residence and left quickly after telephone conversations with a CI interested in purchasing drugs, probable cause existed to believe that Defendant Jesus Ramon Sicairos-Sicairos used the residence to store the illegal drugs that he was selling.  (Id. at 25-26.)  Judge Johnson therefore properly recommended that the Court deny the Motions to Suppress with respect to the evidence seized from the residence.

## IV.  Conclusion

ACCORDINGLY, the Court **ADOPTS** the Non-Final Report and Recommendation of United States Magistrate

43

Judge Walter E. Johnson [55], **DENIES** the Motion to Suppress filed by Defendant Jesus Sicairos-Sicairos [28], and **DENIES** the Motion to Suppress filed by Defendant Felipe Sicairos-Sicairos [29].

IT IS SO ORDERED, this the ⟍⟍ day of July, 2011.

UNITED STATES DISTRICT JUDGE

44